**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————
:
EDUCATIONAL IMPACT, INC.              :
                                      :
                    Plaintiff,        :
                                      :        Civil Action No. 14-937 (FLW)(LHG)
        v.                            :
                                      :                **OPINION**
CHARLOTTE DANIELSON, et al.,          :
                                      :
                    Defendant(s).     :
———————————————————  :

**WOLFSON**, **United States District Judge**:

This case arises out of a seven-Count Amended Complaint filed by Plaintiff Educational

Impact, Inc. ("Plaintiff" or "EI"), against Defendants Charlotte Danielson ("Danielson");

Outcomes Associates, Inc. ("OA"), The Danielson Group LLC ("DGLLC" or "the Danielson

Group"), and Teachscape, Inc. ("Teachscape") (all defendants collectively "Defendants";

Danielson, Outcomes Associates and The Danielson Group collectively "Danielson

Defendants"). The Amended Complaint asserts claims of: (Count 1) violations of the Lanham

Act, 15 U.S.C. § 1125(a), against Teachscape and DGLLC; (Count 2) unfair competition, against

Teachscape and DGLLC; (Count 3) breach of contract, against Danielson and OA; (Count 4)

tortious inference with contract, against Teachscape and DGLLC; (Count 5) tortious interference

with current and prospective economic advantage, against all defendants; (Count 6) injunctive

relief against all defendants; and (Count 7) unjust enrichment against Danielson and OA.

The Danielson Defendants and Teachscape filed separate Motions to Dismiss based on

Rule 12(b)(6) on the same date; Teachscape also filed a Motion to Strike in the same papers.

Because the motions involve overlapping arguments, they are both addressed in this Opinion.

1

The Danielson Defendants assert that the Amended Complaint fails to state a claim for breach of contract; that the claims other than breach of contract are barred by the "gist of the action" and "economic loss" doctrines; that the Amended Complaint fails to state a claim for a Lanham Act violation, unfair competition, tortious interference with contract, tortious interference with current or prospective economic gain, or for unjust enrichment; and that injunctive relief is not an independent claim. Teachscape asserts that the Amended Complaint fails to state claims for a Lanham Act violation, unfair competition, tortious interference with contract, or tortious interference with current or prospective economic gain; and that injunctive relief is not a cause of action. Teachscape also requests that the Court strike references to the 2013 Framework for Teaching. Finally, Teachscape argues that EI violated Local Rule 8.1 by including a claim for a specific amount of damages, and requests that EI specify the basis for this amount.

For the reasons that follow, the Motions to Dismiss filed by Teachscape and the Danielson Defendants are denied in part and granted in part. Specifically, Count 4, tortious interference with contract, is dismissed with regard to Teachscape for failure to adequately plead the elements of the claim; however, DGLLC's Motion to Dismiss Count 4 is denied. Count 5, tortious interference with current and prospective economic advantage, is dismissed as time-barred as to all Defendants. Count 6, injunctive relief, is dismissed because injunctive relief is not a cause of action but only a remedy. Finally, Count 7, unjust enrichment, is dismissed because the facts alleged on the face of the complaint show that there is no cause of action. The Motion of Danielson and OA to Dismiss Count 3, for breach of contract, is denied; however, any claims for punitive damages or lost profits under that count must be dismissed as barred by the contract. The motions for dismissal of Count 1, violation of the Lanham Act and Count 2, unfair competition, are denied as to all Defendants. Teachscape's Motion to Strike references to the

2013 Framework for Teaching is also denied; the motion to strike references to specific amounts of damages is granted, though the Court declines to order the sanctions requested by Teachscape.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts described here come from Plaintiff's Amended Complaint and the documents attached to the Amended Complaint, and are assumed to be true for the purpose of these motions. Danielson, an individual living in Princeton, N.J., works in the field of teacher and administrator training, teacher evaluation, and teacher and administrator professional development. Am. Compl. at ¶ 11. DGLLC, which was created by Danielson, "engages the services of independent consultants, trainers, and contractors to provide face-to-face training on the use of the Framework for Teaching." *Id.* Danielson also does business under the fictitious name "Outcome Associates," and through the New Jersey corporation, Outcome Associates, Inc. *Id.* at ¶ 12.

In 1996, Danielson wrote a book entitled "Enhancing Professional Practice—A Framework for Teaching." *Id.* at ¶ 14. The book included a rubric designed to evaluate teacher performance, which is referred to as the "Framework for Teaching" ("Framework" or "FFT"). *Id.* at ¶ 15. The Framework was initially released with the 1996 book, but Danielson released later iterations in 2007, 2011, and 2013. *Id.* at ¶ 20. According to the Complaint, each iteration of the Framework contains the same four "domains" which are subdivided into the same 22 sub-components; the 2011 and 2013 iterations additionally include "critical attributes," "possible examples," and some modified language defining levels of performance within each sub-component. *Id.* at ¶ 21. The 2011 and 2013 versions "are substantially the same, with the only differences being minor edits of the language used." *Id.* The Framework has become a widely-

used rubric in educational systems, and has been adopted by several states as their model for training and evaluating teachers. *Id.* at ¶ 22.

EI, a Pennsylvania corporation, "is in the business of developing, creating, marketing, and selling online professional development programs and services," including programs and services for teaching evaluation and training. *Id.* at ¶ 10. EI extensively uses real classroom video in its programs. *Id.* at ¶ 24. On September 30, 2006, EI and Outcomes Associates[1] entered into a contract, the terms of which provided that the parties would design and create a video-based online professional development program based on the Framework for Teaching. *Id.* at ¶¶ 27–28. Pursuant to the contract, EI was responsible for all budgets costs, which were estimated to be $60,000. Am. Compl. Ex. A. at "Online Programs Budget" and "Project Funding." All obligations for which the parties were mutually responsible were to be met by February 1, 2007, *see id.* at "Joint Obligations of EI and OA," and the "launch date" of the online program was to be December 1, 2007, *id.* at "Term and Termination." The contract provided that "any change or modification to the Online Program(s) requested by either party after the execution of the Program Schematic Document shall be considered a change order," to which all the parties must agree, and which must be in written form. *Id.* at "Change Orders." Most significantly for this case, the contract included a section titled "Exclusivity; Non-Competition," which stated:

> OA shall not license or otherwise make available to a third party, for delivery over the Internet or through CD-ROM, any of the content used to create the online program. This prohibition shall include any OA content that, if used to create a similar online program, would compete with the Online Training Program contemplated herein. OA shall have the absolute right to use the content for his [sic] own benefit and continue to market and deliver the content via a format other than over the Internet or CD-ROM. Nothing in this section

---

[1] In the contract, the name Outcome Associates does not have the suffix "Inc." attached and it is not identified as a corporation anywhere in the contract. Am. Compl. at 27, *see also* Ex. A.

> limits or shall be construed to limit OA's right to engage in any other
> activity on the Internet except as expressly set forth in this section.
>
> Each party agrees it will not employ or offer employment to, or
> make any other sales, service or consulting arrangement with any
> individual employed by the other during the term of the agreement.
> This restriction shall survive the completion of the online program
> and extend for a period of two years after said completion.

[*Id.*]

Both parties were given the right to sell the Online Program. *Id.* at "Sale of the Online Program and Program Price." The first $60,000 of net proceeds from the sale of the Online Program were to be paid to EI directly; any net proceeds thereafter were to be divided among the parties according to a formula in the contract. *Id.* at "Proceeds from the Sale of the Online Program." The contract terminates on the 20th anniversary of its execution. *Id.* at "Term and Termination."

To fulfill the contract, Danielson chose existing EI classroom videos for use in the program, and EI filmed Danielson explaining each video example. Am. Compl. at ¶ 32. According to the Complaint, "Danielson insisted that the initial content created for the Framework for Teaching Online Program include a supporting PDF digital version of the 2007 iteration of the Framework for Teaching rubric." *Id.* at ¶ 33. After the Online Program was completed, EI's CEO, George Elias ("Elias"), flew to Las Vegas to present the program to DGLLC; at the presentation, Danielson encouraged the contractors to refer opportunities to EI, and arranged an additional commission for contractors who did so. *Id.* at ¶ 35.

The Framework for Teaching Online Program was launched in the spring of 2008. *Id.* at ¶ 42. When the Online Program was launched, it was the only online program to combine classroom video with commentary from Danielson on the Framework for Teaching. *Id.* at ¶ 38. Beginning in 2009, the United States Department of Education's new program, "Race to the Top," resulted in many states adopting the Framework for Teaching, or a modified version of it,

as a comprehensive teacher evaluation rubric. *Id.* at ¶¶ 53–56. This in turn led to "a dramatic increase in interest in the Framework for Teaching Online Program," which both EI and Danielson marketed to state departments of education and school systems. *Id.* at ¶¶ 57–58.

After getting customer feedback, the parties agreed to add more online video content, including further video with commentary from Danielson. *Id.* at ¶ 48. In late 2009, Danielson told Elias that she was considering developing an updated version of the Framework for Teaching, and that this new version would be the basis for the new online content. *Id.* at ¶ 50. Danielson told Elias she intended to use knowledge gained while working at the Bill and Melinda Gates Foundation's "Measures of Effective Teaching" project to develop a new version of the Framework for Teaching to be used by EI. *Id.* The new content was released in phases in 2009 and 2010. *Id.* at ¶ 52.

In a February 21, 2010 email, Danielson allegedly referred to the ongoing development of the 2011 Framework for Teaching, mentioning what she had learned "from the big Gates-funded research study." *Id.* at ¶ 61, Ex. F. In an April 2010 email, Danielson sent EI an updated version of the Framework for Teaching rubric to be used in on the Online Program; the updated version allegedly later became the rubric for the 2011 Framework for Teaching. *Id.* at ¶ 62, Ex. H. On October 17, 2010, Danielson sent EI "fully completed evaluations for classroom videos that were used in EI's third release of the Framework for Teaching Online Program. All of the evaluations were done with the rubric set forth in the 2011 and 2013 iterations of the Framework for Teaching." *Id.* at ¶ 59, *see also id.* Ex. E.

In 2011, Danielson requested that EI update the Framework for Teaching Online Program and the associated training manual. *Id.* at 60. Danielson insisted that EI include the most updated version of the Framework for Teaching rubric, which was the 2011 version, and her staff sent EI

copies of the updated version. *Id.* In an October 9, 2011 email, Danielson told EI that "It would be important to use the most current version of the 'critical attributes' document—it's attached," and included the 2011 version of the rubric. *Id.* at ¶ 64, Ex. I. Additional emails sent to EI by Danielson in 2010 also include references to the "critical attributes" section of the program, which was new to the 2011 version. *Id.* at ¶¶ 65–66, ¶ 21.

In or around February 2010, Danielson began discussions with Teachscape, a direct competitor of EI, regarding the development of a "psychometric assessment tool." *Id.* at ¶¶ 68, 13. Danielson told EI that any psychometric assessment tool developed by Teachscape would not compete with EI's Framework for Teaching Online Program. *Id.* at ¶ 69. On October 12, 2010, Teachscape attempted to license the "Danielson videos" directly from EI. *Id.* at ¶ 89; Ex. Y. The Complaint alleges that Teachscape knew that Danielson had created the 2011 version of the Framework for Teaching rubric specifically for the Online Program created with EI. *Id.* In January of 2011, Danielson informed EI that she and Teachscape had formally begun to work together, but again stated that any psychometric assessment tool would not compete with EI. *Id.* at ¶¶ 70–71. However, business referrals from Danielson to EI began to decline in the summer of 2011. *Id.* at ¶ 72. In January 2012, Danielson informed EI that she had entered into an exclusive arrangement with Teachscape, meaning that neither Danielson, nor the consultants and trainers which were part of DGLLC would be able to continue to work with EI in any capacity. *Id.* at ¶ 73. The independent contractors of DGLLC were prohibited from doing business with EI, including referring potential customers to EI. *Id.* at ¶ 74. For example, a contractor with DGLLC, who had previously referred customers to EI, sent EI an email on January 20, 2012, which stated that "[i]n light of Charlotte's decision about the Danielson Group working with Educational Impact, I am going to have to decline any future projects"; in November 2013, the same

contractor stated that she was "no longer employed or involved in any way with [DGLLC] other than as an independent contractor" and that she wished to renew her relationship with EI. *Id.* at ¶¶ 86–87; Exs. W, X.

At first, Danielson was "vague" in explaining to EI how she and Teachscape intended to work together, but EI gradually became aware that Danielson and Teachscape were creating a series of online programs that allegedly competed directly with the Framework for Teaching Online Program, and used the same rubric as that program. *Id.* at ¶¶ 75–76. EI informed Danielson that she was violating the non-compete clause of the contract; Danielson, in a November 30, 2012 email, stated "I agree that EI and Teachscape have merged into the same 'space' although that was not the case initially." *Id.* at ¶ 77; *see id.* at Ex. P.

The new product from Danielson and Teachscape had a significant amount of sales, and led to a decrease in EI's sales. *Id.* at ¶¶ 79–80. In 2012, Teachscape began to represent that it was the "exclusive digital provider," for Danielson's new versions of the Framework for Teaching Evaluation Instrument. *Id.* at ¶ 81; Ex. Q. Teachscape's website, for example, stated that Teachscape's products "are the only software products authorized for use with the 2011 and 2013 Editions." *Id.* at ¶ 82, Ex. R. DGLLC's website similarly stated that only Teachscape could incorporate the 2011 and 2013 Framework for Teaching Evaluation Instruments in its software products. *Id.* at ¶ 83, Ex. S.

On October 27, 2013, a DGLLC contractor contacted EI to ask about using EI videos in her seminars; upon investigation, EI discovered that Danielson had directed DGLLC employees and contractors to download EI videos and use them in seminars and training programs. *Id.* at ¶¶ 90–91. EI told the contractor that the use of the videos was not permitted; prior to that email, no consent was requested from EI to use the videos. *Id.* at ¶¶ 91–93.

EI alleges that "as a direct and proximate result of Defendants' conduct, EI has suffered significant damages," and asserts that the damages exceed $20 million. *Id.* at ¶ 94.

On February 11, 2014, EI filed a Complaint against Defendants. The Danielson Defendants filed a Motion to Dismiss on April 17, 2014; Teachscape filed a Motion to Dismiss on April 30, 2014. EI filed the present Amended Complaint on May 9, 2014. The Danielson Defendants and Teachscape separately filed the current Motions to Dismiss on June 20, 2014.[2]

## II. STANDARD OF REVIEW

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, "[a]lthough the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149–50 n. 3 (1984) (quotation and citation omitted). A district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer

---

[2] On September 30, 2014, Teachscape filed a Motion to Stay suits for copyright infringements filed by EI in other jurisdictions against several school districts which were Teachscape customers, on the basis that the suits arose out of the same contract as in the present case, and were dependent on the same issues to be decided here. On November 10, 2014, this Court granted the Motion and enjoined prosecution of these and other similar suits. The Motion to Stay is not at issue here.

evidence to support the claim.'" *Bell Atlantic v. Twombly*, 550 U.S. 544, 583 (2007) (quoting *Scheuer v. Rhoades*, 416 U.S. 232, 236 (1974)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for all civil actions.") (internal citations omitted); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("*Iqbal* . . . provides the final nail-in-the-coffin for the 'no set of facts' standard that applied to federal complaints before *Twombly.*").

Following the *Twombly/Iqbal* standard, the Third Circuit applies a two-part analysis in reviewing a complaint under Rule 12(b)(6). First, a district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. *Fowler,* 578 F.3d at 210. Second, a district court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* A complaint must do more than allege the plaintiff's entitlement to relief. *Id.* However, this standard "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 127 U.S. at 1965); *see also Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim . . . . The pleading standard is not akin to a probability requirement, . . . to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citations omitted)). Nonetheless, a court need not credit either "bald assertions" or "legal conclusions" in a complaint when deciding a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429–30 (3d Cir. 1997). The defendant bears the burden of showing

that no claim has been presented. *Hedges v. U.S.*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

Finally, a court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. *Southern Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999). However, to the extent that the documents attached to the complaint contradict the factual allegations alleged in the complaint, the documents will control. *Goldenberg v. Indel, Inc.* 741 F. Supp. 2d 618, 624 (D.N.J. 2010) (citing *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 n.8 (3d Cir.1994)).

## III. DISCUSSION OF MOTION TO DISMISS

The Danielson Defendants first argue that the Amended Complaint fails to state a claim for breach of contract, and that all the other claims are barred by the "gist of the action" and "economic loss doctrines." Because these issues impact all of the claims in the case, I will address them first. Next, I will address the arguments made by both the Danielson Defendants and Teachscape that the Amended Complaint fails to state a claim for a Lanham Act violation, unfair competition, or tortious interference, and that the count for "injunctive relief" should be dismissed. Finally, I will address Danielson and OA's argument regarding the unjust enrichment claim and then Teachscape's motion to strike.

The contract states that "the laws of the state of Pennsylvania shall govern this agreement," Am. Comp. Ex. A, and neither party disputes that on questions of state law, Pennsylvania law applies to all the claims in this case.

### A. Breach of Contract—Danielson and OA

11

Danielson and OA argue that Count 3 of the Amended Complaint fails to state a claim for breach of contract. Danielson Br. at 7. They contend that the contract between EI and OA does not support the factual allegations made in the complaint. *Id.* at 8. Specifically, Danielson and OA assert that any exclusive right that the contract granted to EI was unambiguously limited to the two-year period following the completion of the Framework for Teaching Online Program. *Id.* at 9–10. Moreover, according to Danielson and OA, EI's argument "presumes that the parties intended that . . . there could never be any online illustration of the advances Danielson has made, and will make, in her scholarship," unless, as EI suggests, the contract gave EI the right to create new programs based on later scholarship. *Id.* at 11. However, Danielson and OA maintain that the contract did not give EI the right to use Danielson's subsequent scholarship because EI did not have the right to update, supplement, or otherwise change the Online Program without further agreement. *Id.* at 11–12.

Danielson and OA further argue that the contract does not preclude Danielson from creating online programs based on her subsequent work. *Id.* at 13. Danielson and OA contend that EI's interpretation of the contract is overly broad, and would lead to absurd results. *Id.* at 14. Finally, Danielson and OA assert that EI's construction violates the law of non-compete provisions. *Id.* at 15-16.

EI argues that Danielson and OA are ignoring the plain language of the contract and the "extensive correspondence by Danielson" showing that Danielson created the 2011 Framework for Teaching for use in the EI Online Program. According to EI, Danielson's conduct and written instructions show that she understood the contractual provision to be in effect after EI updated the Online Program with the 2011 Framework for Teaching. *Id.* at 29. EI Danielson Opp. at 23. EI additionally points out that the two-year limitation is in a paragraph discussing "poaching"

12

employees, which is separate from the paragraph forbidding OA from licensing the content used to create the online program. *Id.* at 28.

The goal of contract interpretation is to determine the intent of the parties. *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69. 75. "When the words are clear and unambiguous, the intent of the parties must be determined from the express language of the agreement." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (internal quotation marks and citation omitted).  Only if a contract term is "'is reasonably susceptible of different constructions and capable of being understood in more than one sense" should the court look beyond the contract at extrinsic evidence. *Id.* (internal quotation marks and citation omitted). If a facially unambiguous term would lead to an unreasonable or absurd result, however, the court may consider an alternative interpretation. *Bohler-Uddeholm America, Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 96 (3d Cir. 2001). Ultimately, if the contract is ambiguous, the interpretation is a question for a jury. *Am. Eagle*, 584 F.3d at 587. As this is a motion to dismiss, if the words of the contract are ambiguous, any external evidence—that is, the facts as alleged in the Amended Complaint, and other documentary evidence attached to the pleading—must be construed in the light most favorable to EI, the non-moving party.

Although Danielson and OA assert that the contract unambiguously limits any "exclusive rights" granted to EI to two years, the language of the contract cannot be clearly read in that manner. The section in question, titled "Exclusivity; Non-Competition," is divided into two paragraphs. The first paragraph provides that "OA shall not license or otherwise make available to a third party, for delivery over the Internet or through CD-ROM, any of the content used to create the online program." Am. Compl., Ex. A. The second paragraph states that "Each party agrees it will not employ or offer employment to . . . any individual employed by the other

during the term of the agreement." *Id.* The second paragraph continues: "This restriction shall survive the completion of the online program and extend for a period of two years after said completion." *Id.* In addition, the contract contains a section entitled "Term and Termination," which states that "The Agreement shall continue in effect for the period (the "Term") commencing on the date hereof and ending on the earlier of the 20th anniversary of this Agreement or the termination of the Agreement pursuant to this section." *Id.*

At the very least, the language providing for a two-year limitation is ambiguous as to whether it applies to both the licensing and employment restrictions, or only to the employment restriction. Indeed, it is a reasonable interpretation of the contract to apply the two-year limit only to the subject of the paragraph in which it appears, namely the employment restriction. Moreover, the "Exclusivity" section must be read together with the 20 year "term" of the contract; if the licensing restriction is limited to only two years, it is unclear what the 20 year "term" of the contract applies to. However, on this motion to dismiss, I do not decide the correct interpretation, because I cannot find, as a matter of law, that the contract is unambiguous.

Furthermore, to the extent the language regarding the two-year contract is ambiguous, the external evidence provided by EI in the Amended Complaint does not clarify the parties' intent. The fact that Danielson instructed EI to update their Online Program using portions of the 2011 Framework for Teaching does not prove that the licensing restriction continued to be in effect for more than two years, as there is no discussion of the restriction in any of the correspondence. All that this evidence shows is that Danielson wanted the EI program to reflect her most recent scholarship.

Finally, Danielson and OA argue that an interpretation of the contract which enforces the exclusivity clause for the entire duration of the contract "violates the basic law of non-compete

provisions generally." Danielson Br. at 15; *see also* Teachscape Br. at 16.[3] EI argues, however, that the relevant section of the contract does not constitute a non-compete clause, but rather constitutes a grant of an exclusive license. EI Teachscape Opp. at 32. The portion of the contract at issue clearly constitutes a restriction on licensing, *see* Am. Compl. Ex. A, "Exclusivity; Non-Competition" ("OA shall not license . . ."), and from that restriction, flows a limitation on competition. OA is restricted from competing with EI in only defined circumstances. As stated below, OA cannot license or otherwise make available to a third party the same content being used by EI, but that restriction is limited to delivery of the content over the Internet or by CD-ROM. While I need not determine here whether the contract granted an exclusive license, the restrictions which apply to non-compete clauses are not applicable here, because any restriction on competition flows from the content licensed under the contract.

The contract is also unclear as to whether Danielson's later scholarship is covered by the licensing restriction. The same "Exclusivity; Non-Competition" section of the contract states that

> "OA shall not license or otherwise make available to a third party, for delivery over the Internet or through CD-ROM, any of the content used to create the online Program. This prohibition shall include any OA content that, if used to create a similar online program, would compete with the Online Training Program contemplated herein."

[Am. Compl. Ex. A.]

An earlier section of the contract defines "content" to mean "specifically the concepts embodied in the Online Program." *Id.* at "Definitions."

---

[3] Although Teachscape is not a party to the claim for breach of contract, Teachscape's arguments regarding the substantive merits of the tortious interference with contract claim turn in part on whether there was a breach of EI's contract.

Again, this language is ambiguous. This confusing and circular language appears to mean that, to the extent that the Online Program was based on the concepts discussed in the 1996 or 2007 versions of the Framework for Teaching, OA is prohibited from licensing those concepts to be used in another Internet or CD-ROM-based program. Under this interpretation, if Danielson continued to use those concepts in the later versions of the Framework for Teaching, as the Amended Complaint alleges, OA and Danielson[4] are prohibited from licensing the later versions for delivery over the Internet or on CD-ROM. However, because "content" is so vaguely defined, and the contract does not provide a definition of "concepts," it is nearly impossible to ascertain, without more, what the parties intended to protect under the exclusivity clause.

Thus, because the language in the contract is ambiguous, and the meaning of the relevant terms cannot be decided on this Motion, Danielson and OA's motion to dismiss the breach of contract claim is denied.

**B. Breach of Contract Claim against Danielson**

The Danielson Defendants also argue, albeit in a footnote, that Danielson herself is not a proper party to the breach of contract claim. Danielson Br. at 9 n.5. EI does not directly respond to this claim, although it notes that, as stated in the Amended Complaint, the contract is ambiguous because "Danielson often did business as "Outcome Associates," the contract does not identify Outcome Associates as a legal entity, Danielson executes the contract, and the contract refers to Outcomes Associates using personal pronouns." EI Danielson Opp. at 33.

---

[4] Although a plain reading of the contract could be interpreted to say that only OA, and not Danielson herself, is prohibited from licensing the content, this interpretation would lead to an absurd result, as it would defeat the purpose of the licensing restriction entirely. No party attempts to argue that the restriction in the contract applies only to OA and not to Danielson.

"It is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract." *Electron Energy Corp. v. Short*, 597 A.2d 175, 177 (Pa. Super. Ct. 1991), *aff'd*, 618 A.2d 395 (Pa. 1993). "However, a person who is contracting as an agent may be found to be personally liable where he or she either executes a contract in his or her own name or voluntarily incurs a personal responsibility." *B & L Asphalt Indus., Inc. v. Fusco*, 753 A.2d 264, 270 (Pa. Super. Ct. 2000)

While the Amended Complaint notes that a corporate entity named "Outcome Associates, Inc." exists, it also alleges that Danielson does business under the fictitious name Outcome Associates. Am. Compl. at ¶ 12. Further, the contract itself states that it is between "Educational Impact, Inc. ("EI") a Pennsylvania Corporation having its principal office at 626 Jacksonville Rd. Suite 105, Warminster PA 18974, and Outcome Associates ("OA") having its principal office at 448 Ewing Street, Princeton NJ, 08540." Am. Compl. Ex. A. The contract also states that "OA desires to create an online professional development program ("Online Program") based on *her* recent book titled *Enhancing Professional Practice*." *Id.* (emphasis added). The contract was signed by Charlotte Danielson, under the heading "Outcome Associates." *Id.* The signature does not indicate in what capacity she signed the contract—that is, whether she executed the agreement as an agent for Outcome Associates or as the principal; in contrast, George Elias, who signed for EI, is listed as "President." *Id.* As the court must accept, on this Motion to Dismiss, EI's contention that Danielson does business as Outcome Associates, and considering that the contract is ambiguous as to whether OA is a corporation, the Amended Complaint sufficiently states a claim for breach of contract against Danielson.

**C. "Gist of the Action" Doctrine**

The Danielson Defendants next assert that EI's tort claims are not separately cognizable under Pennsylvania law, due to the "gist of the action" and "economic loss" doctrines. Danielson Br. at 16. The Danielson Defendants contend that EI's tort claims turn on obligations that are owed solely as a result of a contract, not the "larger social policies embodied in the law of torts." *Id.* at 19. EI notes that the economic loss doctrine only bars claims sounding in negligence, and does not apply to intentional torts. EI Danielson Opp. at 30. EI further argues that the Lanham Act claim, being based on a federal statute, cannot be barred by a state doctrine. *Id.* at 32. EI also argues that the wrongs alleged in the Amended Complain "form independent causes of action," and hence damages are not barred by the contract. *Id.* at 33.

"Under Pennsylvania law, the 'gist of the action' doctrine 'precludes plaintiffs from recasting ordinary breach of contract claims into tort claims.'" *Jones v. ABN Amro Mortgage Grp., Inc.*, 606 F.3d 119, 123 (3d Cir. 2010) (quoting *Erie Ins. Exch. v. Abbott Furnace Co.*, 972 A.2d 1232, 1238 (2009)).[5] "The doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 619-20 (E.D. Pa. 2010) (internal quotation marks and citation omitted), *see also eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 19 (Pa. Super. Ct. 2002)). A court must ask whether the defendant's allegedly

---

[5] Similarly, the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995). However, as EI notes, the economic loss doctrine currently applies only to tort claims sounding in negligence. *Knight v. Springfield Hyundai*, 81 A.3d 940, 951-52 (2013). As EI has asserted intentional torts, this doctrine is not applicable here.

wrongful actions arose from "the larger social policies embodied in the law of torts rather than the terms of the contract." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 105 (3d Cir. 2001) (internal quotation marks and citation omitted). Thus, for example, a breach of fiduciary duty which is "inextricably intertwined" with a contract will be barred by the gist of the action doctrine; in contrast, if an obligation of fiduciary duty is imposed "as a matter of social policy rather than by mutual consensus," the doctrine will not bar such a claim. *Brown & Brown*, 745 F. Supp. 2d at 620–21.

The gist of the action doctrine however, can only benefit Outcome Associates or Danielson, and cannot apply to claims against Teachscape or DGLLC. Because the gist of the action doctrine applies "where the duties essentially flow from an agreement between the parties," "[a]s a logical inference then, a party who was not in contractual privity with the plaintiff cannot invoke the gist of the action doctrine to foreclose tort claims against him or her." *The Knit With v. Knitting Fever, Inc.*, Civ. No. 08-4221, 2009 WL 3427054, at *17 (E.D. Pa. Oct. 20, 2009); *see also Centimark Corp. v. Pegnato & Pegnato Roof Mgmt., Inc.*, Civ. No. 05-708, 2008 WL 1995305, at *13-14 (W.D. Pa. May 6, 2008) (holding that individual defendants "cannot invoke the gist of the action doctrine to foreclose litigation of the conversion claim against them individually because they, as individuals, were not parties to the contract"). Thus, even where a defendant signed his name to the contract in question, because "it was executed by him in his capacity of CEO," that defendant was not a party of the contract and could not benefit from the gist of the action doctrine. *Centimark Corp.*, Civ. No. 08-4221, 2009 WL 3427054, at *17.

As noted above, the facts as alleged in the Amended Complaint show that Danielson may be a party to the contract in addition to OA. Assuming the truth of the Amended Complaint,

though, DGLLC cannot claim the benefit of the gist of the action doctrine, because it was not a party to the contract. *See Centimark Corp.*, Civ. No. 08-4221, 2009 WL 3427054, at *17. The Danielson Defendants have not made any claim that DGLLC was in any kind of contractual privity with EI, and such a determination could not be made solely on the basis of the facts as alleged in the Amended Complaint. It is without question, moreover, that Teachscape was not a party to the contract. Thus, at this time, the only claims that could be dismissed as a result of the gist of the action doctrine are claims against OA and Danielson.

The only claims asserted against OA and Danielson are Count 3, breach of contract, Count 5, tortious interference with current and prospective economic advantage, Count 6, injunctive relief, and Count 7, unjust enrichment. Breach of contract, of course, cannot be dismissed on the basis of the gist of the action doctrine. Injunctive relief, as will be discussed *post*, is not an independent claim for relief. A claim for unjust enrichment cannot arise out of a contract, because, as will be discussed *post*, the claim requires that there not be a valid contract.

In Count 5, tortious inference with current and prospective economic advantage, EI contends that the Defendants, including OA and Danielson, interfered with its business relationships with trainers and consultants who were independent contractors of DGLLC. Am. Compl. at ¶¶ 124–129. The duty to refrain from interfering with business relationships arises from "larger social policies," rather than from contract. Although some contracts might include an obligation to refrain from interfering with independent contractors, the contract here does not refer to such contractors at all. *See* Am. Compl. Ex. A., at "Exclusivity; Non-Competition" (forbidding each party from offering employing to "any individual *employed* by the other" (emphasis added)). Count 5 is therefore not barred by the gist of the action doctrine, and the Motion to Dismiss under this doctrine is denied.

20

### C. Damages Barred by Contract

The Danielson Defendants contend that EI's claims for damages are precluded by the contract itself. Danielson Br. at 20. In response, EI asserts that the contract was only with OA,[6] and that the other Defendants cannot assert that the limitation on damages protects them. EI Danielson Opp. at 33. EI also argues that it has alleged wrongs that are causes of action independent of the contract. *Id.* The Danielson Defendants maintain that even if such claims are independent of the contract, EI is still not permitted to seek damages on the breach of contract claim.

The contract states that "under no circumstances shall either party be entitled to punitive damages or damages for loss of profits pursuant to the terms of this agreement." Am. Compl. Ex. A. at "Term and Termination." Count 3 of the Amended Complaint, which asserts breach of contract, requests an award "in excess of Seventy Five Thousand Dollars." Am. Compl. at Count III, Prayer for Relief ¶ E. Although the Amended Complaint states that "as a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages," *id.* at ¶ 114, it does not clarify whether those damages are for lost profits or some other kind of damages.

This term of the contract is clear, and therefore to the extent that Count 3 requests either punitive damages or damages for lost profits from Danielson or OA, such damages are barred.

### D. Lanham Act and Unfair Competition—DGLLC and Teachscape

According to the Amended Complaint, Teachscape's website stated that Teachscape's products "are the only software products authorized for use with the 2011 and 2013 Editions." Am. Compl. at ¶ 82, Ex. R. DGLLC's website similarly stated that "only Teachscape can

---

[6] Because EI asserts in its Complaint and argues that Danielson was a party to the contract, she must also have the benefit of the limitation on damages in the contract.

incorporate the content of the Framework for Teaching Evaluation Instrument (2011 and 2013) in its software products." *Id.* at ¶ 83, Ex. S. According to the Complaint, these statements constitute a violation of the Lanham Act, and create a claim of common-law unfair competition.

DGLLC argues that Count I and Count II of the Amended Complaint fail to state a claim under the Lanham Act and under common-law unfair competition and therefore, as a matter of law, the claims should be dismissed. Danielson Br. at 22. DGLLC notes that EI does not allege in the Amended Complaint that any of the "Danielson Defendants disparaged, criticized or denigrated EI's Online Program in any way." *Id*. DGLLC additionally argues that the language, "The Danielson Group has entered into an exclusive agreement with Teachscape for the digital rights to publish and distribute software products based upon the *Framework for Teaching Evaluation Instrument* (2011 and 2013)" is not a false statement of fact; even if EI was able to *reference* the 2011 Framework for Teaching in its online videos, only Teachscape is permitted to incorporate it into software programs, *id.* at 23; and, finally, this statement does not violate the Lanham Act or cause unfair competition because the statement was not made in "commercial advertising or promotion." *Id.* at 24. DGLLC asserts it is is not in "commercial competition" with EI, which is a necessary component of commercial advertising.

Similarly, Teachscape argues that its own statements of exclusivity "are false only if EI is the 'exclusive licensee of the Framework for Teaching.'" Teachscape Br. at 7. According to Teachscape, however, the Contract does not grant EI the rights to any of Danielson's work once the Online Program was launched in 2008. *Id.* at 8. Teachscape contends that none of the emails from Danielson granted any rights to EI to the later version of the Framework for Teaching, because none of those emails constituted a "change order" under the contract. *Id.* at 9. Moreover, Teachscape asserts that EI has no basis at all to claim a right to the 2013 FFT, which postdated

22

all of the emails cited. *Id.* at 10. Further, Teachscape argues that its claims are not false, because the Amended Complaint fails to allege that the Online Program incorporates the FFT into software. *Id.* at 11.

EI argues that it has stated a claim for a Lanham Act violation and for unfair competition. EI Danielson Opp. at 33; EI Teachscape Opp at 24. EI contends that it has an exclusive license to the Framework for Teaching. EI Danielson Opp. At 34; EI Teachscape Opp. At 25. EI further asserts that the 2011 and 2013 Framework for Teaching are covered by the contract because Danielson created the 2011 FFT for the Online Program, and instructed EI to incorporate it. EI Danielson Opp. at 35; *see also* EI Teachscape Opp. at 25–30 (describing emails between Danielson and EI).  EI alleges, moreover, that the 2013 and 2011 FFTs are substantially the same. EI Danielson Opp. at 35. Finally, EI contends that DGLLC is "working in concert with Teachscape (which is unquestionably a direct competitor of EI) to sell a product jointly that competes with EI's Online Program. *Id.* at 36.

The Lanham Act, in relevant part, provides that:

> (a)(1) Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any . . . false or misleading description of fact, or false or misleading representation of fact, which-

> . . . (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her . . . goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

> [15 U.S.C. § 1125(a)(1)(B).]

In order to establish a Lanham Act, a plaintiff must prove:

> (1) that the defendant has made false or misleading statements as to his own product [or another's]; (2) that there is actual deception or

23

at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

[*Warner-Lambert Co. v. BreathAsure, Inc.*, 204 F.3d 87, 91–92 (3d Cir. 2000)].

Unfair competition claims under Pennsylvania law parallel those under §43(a) of the Lanham Act, other than the requirement for goods to travel in interstate commerce. *KDH Elec. Sys., Inc. v. Curtis Tech. Ltd.*, 826 F. Supp. 2d 782, 807 (E.D. Pa. 2011).

DGLLC notes, correctly, that courts in this District and others use a four-prong test to determine what is considered "commercial advertising or promotion." *See Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 456 (D.N.J. 2009); *TriState HVAC Equipment, LLP v. Big Belly Solar, Inc.*, 836 F. Supp. 2d 274, 286 (E.D. Pa 2011). The four elements of a commercial advertisement or promotion are: "(1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) for the purpose of influencing customers to buy the defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within the industry." *Gordon & Breach Science Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1537 (S.D.N.Y. 1994). However, DGLLC's assertion that because DGLLC is not in "commercial competition with plaintiff" there can be no violation of the Lanham Act is incorrect. Last year, the Supreme Court repudiated a "direct-competitor test" for standing under the Lanham Act, stating that "the direct-competitor test provides a bright-line rule; but it does so at the expense of distorting the statutory language." *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392 (2014). In that case, although the parties were not direct competitors, the Court held that

24

"competition is not required for proximate cause; and that is true even if the defendant's aim was to harm its immediate competitors, and the plaintiff merely suffered collateral damage." *Id.* at 1394.

Here, although DGLLC is not in direct competition with EI, the claims made on its website, if shown to be false, likely have the effect of limiting EI's sales. Under current law, this allegation is sufficient to state a claim under the Lanham Act.

However, both DGLLC and Teachscape also assert that the claims on their respective websites are not false, even under the allegations of the Amended Complaint, because only Teachscape has the right to incorporate the Framework for Teaching into software products.[7] The Defendants' argument requires a finding that the EI Online Program does not constitute software. I cannot make such a finding at this time. Merriam-Webster defines "software" as "the programs that run on a computer and perform certain functions."[8] As described in the Amended Complaint and the contract, EI's Online Program is a "video-based online professional development program," Am. Compl. at ¶ 28, which also includes PDF "online handout[s]," *id.* at ¶ 33. It is not clear why a program that operates online, using videos and PDF handouts, would not constitute software. The Amended Complaint therefore states a claim for violation of the Lanham Act and for unfair competition.

---

[7] The Defendants reiterate their assertions that the Contract does not give EI any right to the 2011 and 2013 FFT, and that the exclusivity provision has expired. These contentions are identical to the ones made regarding the breach of contract claim, and as the Court has already determined that this claim cannot be dismissed at this juncture, these arguments will not be discussed again.

[8] *Software*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/software (last visited Jan. 26, 2015).

DGLLC and Teachscape's Motions to Dismiss Counts 1 and 2 of the Amended Complaint are therefore denied.

**E. Tortious Interference Claims**

Both Teachscape and the Danielson Defendants argue that the Amended Complaint fails to state a claim for tortious interference with contract (against DGLLC and Teachscape only) and tortious interference with prospective economic advantage (against all Defendants). The Defendants each make essentially the same arguments, which are as follows: (1) the claims are time-barred; (2) the Amended Complaint fails to allege facts showing that the Defendants acted with specific intent to harm; (3) the Amended Complaint fails to allege facts showing that the Defendants lacked privilege or justification; (4) there was no tortious interference with contract because EI had no right to the 2011/2013 Framework for Teaching; (5) there was no tortious interference with prospective economic advantage because the EI has not identified what was interfered with.

As an initial note, Count 5 of the Amended Complaint asserts a claim for "tortious inference with current and prospective economic advantage." However, a "claim for intentional interference with prospective economic advantage is best described under Pennsylvania law as one for tortious interference with contractual relations*." Binary Semantics Ltd. v. Minitab, Inc.*, No. 4:07-cv-1750, 2008 WL 1981591, at *2 (M.D. Pa. May 1, 2008); *see also ClubCom, Inc. v. Captive Media, Inc.*, No. 02:07-cv-1462, 2009 WL 249446, at *7 (W.D. Pa. Jan. 31, 2009) ("Pennsylvania does not recognize a tort for 'intentional interference with prospective economic advantage,' but does apply its 'intentional interference with contractual relations' tort to prospective contracts."); *Blackwel v. Eskin*, 80 Pa. D. & C.4th 284 (Com. Pl. 2006), *aff'd sub nom. Blackwell v. Eskin*, 916 A.2d 1123 (Pa. Super. Ct. 2007) (Stating that there is no claim

26

under Pennsylvania law for "interference with prospective economic advantage" but construing

the claim as one for "tortuous [sic] interference with prospective contractual relations"). I will

thus construe this claim as one for tortious interference with prospective contractual relations.

Claims for tortious inference with existing or prospective contractual relations "share

essentially the same elements." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494,

529 (3d Cir. 1998). These are:

> (1) the existence of a contractual, or prospective contractual relation between itself and a third party;
>
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent the prospective relation from occurring;
>
> (3) The absence of a privilege or justification on the part of the defendant;
>
> (4) the occasioning of actual legal damage as a result of the defendants' conduct; and
>
> (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference of the defendant
>
> [*Id.* at 530 (quoting *Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1988)).]

### 1. Time-Bar

Defendants assert that Plaintiff's tortious interference claims are subject to a two-year

statute of limitations. Danielson Br. at 27; Teachscape Br. at 25. Defendants argue that Danielson

informed EI of her relationship with Teachscape in January of 2012, and the claim accrued at

that time. *Id.* EI argues, however, that EI was unaware that Danielson was creating a competing

product with Teachscape until November 30, 2012, when Danielson admitted that her new

27

product "merged into the same space" as EI's Online Program. EI. Danielson Opp. at 38; EI Teachscape Opp. at 36.

"Under the law of this and other circuits . . . the limitations defense may be raised on a motion under Rule 12(b)(6), but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) (quoting *Hanna v. United States Veterans' Administration Hospital*, 514 F.2d 1092, 1094 (3d Cir. 1975)). "Pennsylvania courts apply the two year statute of limitations of 42 Pa. C.S.A. § 5524(3) to tortious interference with contractual relations claims." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.,* 357 F.3d 375, 383 (3d Cir. 2004). Under Pennsylvania and Third Circuit law, "a statute of limitations begins to run only once a plaintiff can assert and maintain an action." *Id.* at 384. Because one element of a claim for tortious interference is "actual legal damages," "a tortious interference claim does not accrue until, at least, the plaintiff suffers injury (i.e., "actual legal damage") as a result of the defendant's conduct." *Id.*

The Amended Complaint alleges that Danielson informed EI that "she entered into an exclusive arrangement with Teachscape" in January of 2012. Am Compl. at ¶ 73. According to the Complaint, at that point Danielson "was vague" in describing her work with Teachscape. *Id.* at ¶ 75. "Over the next few months," EI gradually became aware that Teachscape's program would compete directly with EI, and Danielson admitted as much in a November 30, 2012 email. *Id.* at ¶¶ 76–77. However, the Complaint indicates that EI became aware in January 2012 that "both Danielson and all of the consultants and trainers that were part of the Danielson Group would no longer be able to work with EI in any capacity," *id.* at ¶ 73. The Complaint further

alleges that one of the independent contractors, Stefanie Hite, informed EI on January 20, 2012, that she would have to "decline any future projects" with EI. *Id.* at ¶ 87; *see also id.* Ex. W.

The initial Complaint was filed on February 11, 2014; to fall within the statute of limitations, the cause of action had to accrue on or after February 11, 2012. Count 4, tortious interference with contract, alleges that DGLLC and Teachscape knowingly caused OA and Danielson to breach the contract with EI, proximately causing damage to EI. Am. Compl. at ¶¶ 119, 122.  Although it is not clear when EI suffered damages as a result of the breach, on the face of the Amended Complaint, the facts do not show that the claim for tortious interference with an existing contract, Count 4, was out of time.[9]

Count 5, which the court is construing as a claim for tortious interference with prospective contractual relations, alleges that Defendants interfered in EI's business by "instructing the independent contractors to cease making referrals to EI," which in turn "cause[d] the independent contractors to terminate their business relationships with EI." Am. Compl. at ¶¶ 127, 130. Although this section mentions that "Defendants spread false and misleading information about Teachscape's purported status as the exclusive licensee," the Amended Complaint does not allege damages based on this behavior in this Count. It is clear from the Complaint that EI was aware that independent contractors could no longer refer business to it as early as January 20, 2012, and that the referrals from the contractors ceased immediately at least as of that date. Thus, EI's claim for tortious inference with prospective contractual relations accrued on January 20, 2012, and was out of time before the filing of the initial Complaint on February 11, 2014. Count 5 is therefore dismissed.

---

[9] The facts as pleaded do not clearly establish when the statute of limitations began to run on Count 4. However, this may be an issue susceptible to dismissal on a motion for summary judgment with a proper evidentiary record.

2. <u>Specific Intent to Harm—Count 4, Teachscape and DGLLC</u>

Both DGLLC and Teachscape assert that EI failed to allege the second element of a tortious interference claim, specific intent to harm. Danielson Br. at 26 n.18, Teachscape Br. at 19. According to Teachscape, "EI's Complaint does not even contain the 'formulaic recitation of the elements of the cause of actions' that *Twombly/Iqbal* hold are insufficient," but merely "alleges conclusorily that Teachscape 'knew that Danielson and Outcome Associates were contractually prohibited from creating a competing product.'" Teachscape Br. at 20. DGLLC similarly argues that the absence from the Amended Complaint "of any facts rendering such intent plausible" requires dismissal. Danielson Br. at 26 n.18. DGLLC further contends that a pleading of this element would have to meet the heightened specificity requirements of the Federal Rule of Civil Procedure 9. EI argues that the Federal Rules of Civil Procedure permit a Plaintiff to "merely allege conditions of the Defendant's mind." EI Danielson Opp. At 39; EI Teachscape Opp. at 33. EI counters, the fact that Teachscape attempted to license the Online Program from EI demonstrates Teachscape's knowledge of the exclusive arrangement between EI and Danielson. EI Teachscape Opp. At 34.

Rule 9(b) states that in a Complaint for fraud or mistake "a party must state with particularity the circumstances constituting fraud or mistake." However, under the same rule, "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* This is not, of course, a claim for fraud or mistake, and EI is not subject to heightened pleading requirements. Nonetheless, in any civil complaint, "it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 66, 663

(20009). Rather "all civil complaints must now set out "sufficient factual matter" to show that the claim is facially plausible." *Id.* Still, "a claimant does not have to 'set out in detail the facts upon which he bases his claim.'" *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"[I]n order to succeed in a cause of action for tortious interference with a contract, a plaintiff must prove . . . that a defendant acted intentionally to harm the plaintiff." *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 2013 PA Super 148, 71 A.3d 923, 934 (2013), reargument denied (Aug. 22, 2013); *see also Glenn v. Point Park College*, 272 A.2d 895, 899 (Pa. 1971) ("The defendant must not only have intended the interference, but must have acted in part at least for the purpose of accomplishing it." (internal quotation marks and citation omitted)). For example, in an Eastern District of Pennsylvania case, a manager allegedly breached the non-compete clause of his contract by soliciting other employees to his new employer. *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 13 F. Supp. 3d 465, 478 (E.D. Pa. 2014). His former employer, OHL, sued the manager for breach of contract and his new employer for tortious interference with contract. *Id.* at 479. The court held that there was no evidence that the new employer intended the manager to breach his contract: "The evidence might lead a reasonable jury to conclude that they intended for [the manager] to employ former OHL employees, which entailed a breach of his covenant, but nothing in the record suggests that they induced this action in order to cause the breach." *Id.* at 479–80.

The Amended Complaint, in Count 4, alleges that "Teachscape and the Danielson Group knew of Danielson and Outcome Associate's contractual relationship with EI" and that they further "knew that Danielson and Outcome Associates were contractually prohibited from

creating a competing product." Am Compl. at ¶¶ 117–18. As proof, the Complaint points to Teachscape's earlier attempt to license EI's Online Program. *Id.* at ¶ 118. This attempt at licensing, however, does not demonstrate that Teachscape knew that Danielson allegedly had an exclusive contract with EI. Further, even assuming Teachscape was aware of the exclusive contract, the Amended Complaint fails to present any facts that tend to show that Teachscape acted with the purpose of interfering with Danielson's relationship with EI, though that may have been a consequence of Danielson's new relationship with Teachscape.  As plead, the Amended Complaint thus does not state a claim for tortious interference with contract against Teachscape, and the claim against Teachscape is dismissed without prejudice.

In contrast, the Danielson Group, which was created, at least in part, by Danielson, must have been aware of the alleged exclusivity provision, and thus acted with the knowledge that the new relationship with Teachscape would allegedly result in Danielson and OA violating their contract with EI. On this Motion to Dismiss, therefore, I cannot conclude that the pleading fails to "raise a right to relief above the speculative level." *Covington*, 710 F.3d at 118. Thus, with respect to DGLLC the Amended complaint sufficiently alleges specific intent to harm.

### 3. Lack of Privilege or Justification—DGLLC[10]

Similarly, DGLLC asserts that, for both tortious interference claims, EI failed to plead the third element of the claim, a lack of privilege or justification. Danielson Br. at 26. DGLLC argues that because the interference arose from the "pursuit of legitimate business interests," the

---

[10] Teachscape also argues that the Amended Complaint merely pleads the conclusion that Teachscape lacked privilege or justification, but does not allege that Teachscape lacked a valid business purpose. Teachscape Br. at 23. However, because Count 4 is being dismissed against Teachscape based on EI's failure to adequately plead a specific intent to harm by Teachscape, it is not necessary to address whether the element of lack of privilege or justification has been properly plead against Teachscape.

Complaint must show that there was wrongful conduct independent from the claim of the intereference itself. *Id.* EI argues that it does not have the burden to allege independently wrongful conduct on the part of the defendant. EI Danielson Opp. at 37.

"The second element of [tortious interference with contract] is closely intertwined with the third element, which requires a showing that Appellant's actions were not privileged." Empire Trucking Co., 71 A.3d at 934. "Thus, in order to succeed in a cause of action for tortious interference with a contract, a plaintiff must prove not only that a defendant acted intentionally to harm the plaintiff, but also that those actions were improper." *Id.* "While some jurisdictions consider a justification for a defendant's interference to be an affirmative defense, Pennsylvania courts require the plaintiff, as part of his prima facie case, to show that the defendant's conduct was not justified." *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 214 (3d Cir. 2009).

To determine whether an interference was lacked privilege or justification, Pennsylvania law requires a trial court to look at the factors of § 767 of the Restatement:

> (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

> [*Empire Trucking Co.*, 71 A.3d at 934 (quoting *Restatement (Second) of Torts* § 767)].

"'Although this evaluation of interests is not always susceptible of precise definition, it is clear that the central inquiry is whether the defendant's conduct is sanctioned by the rules of the game which society has adopted.'" *Id.* (quoting *Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008)).

The Amended Complaint asserts that Teachscape and DGLLC caused Danielson and OA to breach their contract with EI "with knowledge of and intentional disregard for EI's rights as the exclusive licensee of the Framework for Teaching . . . [and of] Danielson and OA's obligation under the non-compete clause." Am. Compl. at ¶ 120. Because, as noted above, the Amended Contract presents sufficient evidence to infer that DGLLC acted with the intent to interfere with EI's contract, this assertion is sufficient to show a lack of privilege or justification. *Cf. BP Envtl. Servs., Inc. v. Republic Servs., Inc.*, 946 F. Supp. 2d 402, 410 (E.D. Pa. 2013) ("Because the contracts between BP and Stericycle were not exclusive, Republic did not act in contravention of 'the rules of the game' when its subsidiary approached Stericycle with its own offer."). However, as noted above, in the absence of any specific intent to harm, Count 4 must be dismissed as against Teachscape.

### 4. Whether an Interference Occurred—DGLLC

The arguments as to whether Teachscape or DGLLC actually interfered in EI's contract are essentially the same as the arguments as to whether a breach of contract actually occurred. These arguments have been addressed above, and need not be discussed again. It suffices to say that because the Amended Complaint presents sufficient facts to maintain a claim for breach of contract, it also presents sufficient facts to maintain a claim for tortious interference with contract. Because Count 5 is time-barred, I will not address the question of whether the Amended Complaint pleads sufficient facts to show interference with prospective contractual relations.

### F. Injunctive Relief

Both the Danielson Defendants and Teachscape argue that Count 6, "Injunctive Relief," should be dismissed because there is no separate cause of action for injunctive relief. Danielson

Br. at 28, Teachscape Br. at 26. EI asserts, however, that because it requests a permanent injunction as part of any judgment against the Defendants, it is must plead the requirements for a permanent injunction. EI Danielson Opp. at 39; EI Teachscape Opp. at 37. The Third Circuit has stated that "an injunction is a remedy rather than a cause of action, so a separate claim for injunctive relief is unnecessary." *Chruby v. Kowaleski*, 534 F. App'x 156, 160 (3d Cir. 2013). Thus, this claim is dismissed.

### G. Unjust Enrichment

Danielson and OA argue that the Amended Complaint fails to state a claim for unjust enrichment against them, and therefore Count 7 should be dismissed. Danielson Br. at 29. According to Danielson and OA, the Amended Complaint does not allege an "unconsummated or void contract," but merely seeks to enforce an existing one. *Id.* at 30. EI, however, asserts that the claim of unjust enrichment may be maintained because the Rules of Civil Procedure permit alternative theories. EI Danielson Opp. at 40. According to EI, unjust enrichment permits a Plaintiff to recover if the contract is unenforceable as to one or more Defendants. *Id.*

"The doctrine of unjust enrichment is clearly inapplicable when the relationship between the parties is founded on a written agreement or express contract." *Roman Mosaic & Tile Co. v. Vollrath*, 313 A.2d 305, 307 (Pa. Super. Ct. 1973) (internal quotation marks and citation omitted). It is clear from the Amended Complaint that EI has a contractual relationship with either OA or Danielson, or both. To the extent that either OA or Danielson was not a party to the contract, but nonetheless received a benefit from it, that benefit nonetheless arose out of the contract, as Danielson does business through OA. Thus, the claim for unjust enrichment is dismissed.

**IV. TEACHSCAPE'S MOTION TO STRIKE**

Teachscape argues that all references to the Framework for Teaching 2013 should be stricken from the Complaint because the FFT 2013 did not exist until well after Danielson had already partnered with Teachscape. Teachscape Br. at 27.

Rule 12(f) of the Federal Rules of Civil Procedure permits a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f); *see Geruschat v. Ernst Young LLP*, 505 F.3d 237, 247 n.9 (3d Cir. 2007). "The purpose of a motion to strike is to simplify the pleadings and save time and expense by excising from a plaintiff's complaint any redundant, immaterial, impertinent, or scandalous matter which will not have any possible bearing on the outcome of the litigation." *Garlanger v. Verbeke*, 223 F.Supp. 2d 596, 609 (D.N.J. 2002); *see Receivables Purchasing Company, Inc. v. Engineering and Professional Services, Inc.*, No. 09–1339, 2010 WL 3488135, at *2 (D.N.J. Aug.30, 2010). "[M]otions to strike are usually 'viewed with disfavor' and will generally 'be denied unless the allegations have *no possible relation* to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.'" *Garlanger*, 223 F.Supp.2d at 609 (citing *Tonka Corp. v. Rose Art Industries, Inc.*, 836 F.Supp. 200, 217 (D.N.J. 1993)) (emphasis added). "Rule 12(f) should be construed strictly against striking portions of the pleading on grounds of immateriality and if the motion is granted at all, the complaint should be pruned with care." *Dicar, Inc. v. Stafford Corrugated Products, Inc.*, No. 05-5426, 2009 WL 1796053, at * 3 (D.N.J. June 22, 2009) (quoting *Morgan Home Fashions, Inc. v. UTI, United States, Inc.*, No. 03-772, 2004 WL 1950370, at * 8 (D.N.J. Feb. 9, 2004)).

Here, the Amended Complaint alleges that the 2011 and 2013 versions of the Framework for Teaching are substantially the same. Am. Compl at ¶ 21. As noted in the discussion of the

breach of contract claim, *supra*, if the contract restricted the use of "concepts embodied in the Online Program," Am. Compl. Ex. A, "Definitions," then to the extent that the 2013 Framework for Teaching utilizes the same concepts, EI may have a claim based on that version. Thus, Teachscape's motion to strike all reference to the 2013 FFT is denied.

Teachscape also contends that EI violated Local Rule 8.1 by including in the facts section of the complaint an allegation that EI suffered damages exceeding $20 million, with the intent to have a "chilling effect." Teachscape Br. at 27–28. Teachscape requests a sanction for this violation, namely a declaration from EI specifying, in great detail, the basis for this claim. *Id.* at 28. E.I. argues that sanctions under Federal Rule of Civil Procedure 11 are inappropriate; Teachscape responds that it does not request sanctions under Rule 11, but for sanctions within the "inherent power" of the Court. Teachscape Rep. Br. at 14.

Local Rule 8.1 states that "[a] pleading which sets forth a claim for relief in the nature of unliquidated money damages shall state in the *ad damnum* clause a demand for damages generally without specifying the amount." To the extent that the assertion of $20 million is a demand for damages, it is improper and will be stricken from the Amended Complaint.

Sanctions, however, are not required. "[I]nherent powers must be exercised with restraint and discretion," and a court "must also ensure that the sanction is tailored to address the harm identified." *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994). A sanction here is not necessary as Teachscape has not alleged any true harm to the Defendants or to the Court.


**V. CONCLUSION**

For the reasons stated above, the Motions to Dismiss filed by Teachscape and the Danielson Defendants are denied in part and granted in part. Specifically, Count 4, tortious interference with contract, is dismissed as to Teachscape for failure to adequately plead the elements of the claim; however, DGLLC's Motion to Dismiss Count 4 is denied. Count 5, tortious interference with current and prospective economic advantage, is dismissed as time-barred. Count 6, injunctive relief, is dismissed because injunctive relief is not a cause of action but only a remedy. Count 7, unjust enrichment, is dismissed because the facts alleged on the face of the complaint show that there is no cause of action. The motion of Danielson and OA to dismiss Count 3, for breach of contract, is denied; however, any requests for punitive damages or lost profit damages under this Count are dismissed as barred by the language of the contract. The motions for dismissal of Count 1, violation of the Lanham Act, and Count 2, unfair competition, are denied. In addition, Teachscape's motion to strike all references to the 2013 Framework for Teaching is denied. The motion to strike the allegation of the specific amount of damages is granted for violating Local Rule 8.1; however, no sanctions will be imposed. An appropriate Order shall follow.

Date:   Jan. 28, 2015                                       __/s/ Freda L. Wolfson_____

                                                            Hon. Freda L. Wolfson, U.S.D.J.